# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| FIR TREE VALUE MASTER FUND, LP, FIR TREE CAPITAL OPPORTUNITY MASTER FUND, LP, and VERITION MULTI-STRATEGY MASTER FUND LTD., | § § § § § | No. 454, 2019 |
| | § | |
| | § | Court Below: Court of Chancery |
| Petitioners Below, Appellants, | § § | of the State of Delaware |
| | § | C.A. No. 12456 |
| v. | § | |
| | § | |
| JARDEN CORPORATION, | § | |
| | § | |
| Respondent Below, Appellee. | § § | |

Submitted: April 15, 2020
Decided: July 9, 2020

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices, constituting the Court *en Banc*.

Upon appeal from the Court of Chancery. **AFFIRMED**.

Michael J. Barry, Esquire, Kimberly A. Evans, Esquire, Kelly L. Tucker, Esquire, Vivek Upadhya, Esquire, GRANT & EISENHOFER P.A., Wilmington, Delaware; *Attorneys for Petitioners-Appellants Fir Tree Value Master Fund, LP, Fir Tree Capital Opportunity Master Fund, LP, and Verition Multi-Strategy Master Fund Ltd.*

Srinivas M. Raju, Esquire, Brock E. Czeschin, Esquire, Robert L. Burns, Esquire, Sarah A. Clark, Esquire, Matthew W. Murphy, Esquire, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Michael J. McConnell, Esquire, Ashley F. Heintz, Esquire, Robert A. Watts, Esquire, JONES DAY, Atlanta, Georgia; *Attorneys for Respondent-Appellee Jarden Corporation.*

**SEITZ**, Chief Justice:

Martin Franklin, the Chief Executive Officer and co-founder of Jarden Corporation, negotiated the corporation's sale to Newell Brands for $59.21 per share in cash and stock. Several large Jarden stockholders refused to accept the sale price and petitioned for appraisal in the Court of Chancery. In a lengthy opinion, the Court of Chancery found that, of all the valuation methods presented by the parties' experts, only the $48.31 unaffected market price of Jarden stock could be used reliably to determine the fair value. The court placed little or no weight on other valuation metrics because the CEO dominated the sales process, there were no comparable companies to assess, and the parties' experts presented such wildly divergent discounted cash flow models that, in the end, the models were unhelpful to the court.

On appeal, the petitioners argue the Court of Chancery erred as a matter of law when it adopted Jarden's unaffected market price as fair value because it ignored what petitioners claim is a "long-recognized principle of Delaware law" that a corporation's stock price does not equal its fair value. They also claim that the court abused its discretion by refusing to give greater weight to a discounted cash flow analysis populated with data selected by petitioners, ignoring market-based evidence of a higher value, and refusing to use the deal price as a "floor" for fair value.

We affirm the Court of Chancery's judgment finding $48.31 as the fair value of each share of Jarden stock as of the date of the merger. There is no "long-recognized principle" that a corporation's unaffected stock price cannot equate to fair value. Although it is not often that a corporation's unaffected market price alone could support fair value, the court here did consider alternative measures of fair value—a comparable companies analysis, market-based evidence, and discounted cash flow models—but ultimately explained its reasons for not relying on that evidence. Finally, Jarden's sale price does not act as a valuation floor when the petitioners successfully convinced the court that the deal price resulted from a flawed sale process, and the court found Jarden probably captured substantial synergies in the sale price.

I.

Martin Franklin co-founded Jarden in the early 2000's.[1] Jarden operated as a decentralized holding company with a large portfolio of consumer product brands in separate operating companies. Franklin served as CEO and board chairman until 2011 when he stepped away from day-to-day operations but remained in charge of capital distribution and M&A activity. By all accounts, Jarden was successful. Towards the end of 2015, Jarden's market capitalization put it among the top 20%

---

[1] We take the essential facts from the Court of Chancery's opinion in *In re Appraisal of Jarden Corp.*, 2019 WL 3244085 (Del. Ch. July 19, 2019).

of all publicly traded firms in the United States. More than twenty professional financial analysts followed Jarden. Jarden's stock traded in a semi-strong efficient market.[2] While CEO, Franklin led Jarden's acquisition of over forty companies and brands focused in niche markets where the brand could expand globally. In 2015, Jarden made two of its largest acquisitions, including the parent of Jostens, Inc., for $1.5 billion.

Like Jarden, Newell operated as a large consumer products company with a vast portfolio of products with household names. As a holding company, Newell owned several portfolio businesses that functioned essentially as independent companies. In 2011, under its new CEO, Michael Polk, Newell implemented a strategic plan that included Project Renewal. By using an integrated operating company model, Project Renewal sought to streamline Newell's business structure and decrease costs by delayering the business. In 2014, Newell embarked on a strategy of pursuing "transformational M&A."[3] Newell engaged Centerview Partners to generate a list of possible targets and to arrange preliminary meetings.

---

[2] *See Verition Partners Master Fund Ltd. v. Aruba Networks, Inc.*, 210 A.3d 128, 138 n.53 (Del. 2019) ("[T]he semi-strong version assumes that markets reflect only all *publicly available* information whereas the strong version assumes that markets reflect *all* information . . . ."); *Dell, Inc. v. Magnetar Glob. Event Driven Master Fund Ltd*, 177 A.3d 1, 7 (Del. 2017) ("[T]he record suggests the market for Dell stock was semi-strong efficient, meaning that the market's digestion and assessment of all publicly available information concerning Dell was quickly impounded into the Company's stock price.").

[3] *Jarden*, 2019 WL 3244085, at *8.

Jarden made the list of targets, but Newell had some reservations because Jarden operated in niche categories, and Polk wanted big, global categories.

While leading Jarden, Franklin had several other ongoing business ventures, including Platform Specialty Products Corporation, which had financial backing from investor William Ackman. In July 2015, when Franklin met with Roland Phillips of Centerview about one of those other ventures, Phillips mentioned that Polk wanted to meet Franklin. Franklin understood that Polk would likely want to discuss a Newell/Jarden transaction and said "he 'would gladly take equity, [and he] ha[d] no issue with someone else running the combined business.'"[4] Later in the month, Franklin expressed to Ackman his willingness to sell Jarden so he could devote more energy to his other businesses. Ackman emailed Warren Buffet and wrote that Franklin would entertain a negotiated sale of Jarden. At the time, however, "Franklin was not authorized by the Board to entertain discussions regarding a sale of Jarden nor did he disclose to the Board his discussions with Phillips or Ackman."[5]

Franklin and Polk first met at an investor conference in September 2015. Their conversation exposed different perspectives regarding their roles. As the court

---

[4] *Id.* at *7 (citation omitted) (alterations in original).
[5] *Id.*

found, "Franklin focused on M&A, while Polk concentrated on organic growth."[6] Franklin confirmed that his team was open to "strategically connecting" with Newell, and they agreed to continue the conversation.[7] Polk reported to Newell's board that Franklin "cut straight to the chase about being willing to sell his company and offered a deeper discussion over the next few weeks."[8] Franklin did not inform the board about his discussions until individual phone calls several days later.

Newell was interested in acquiring Jarden in part because it believed it could apply the same "playbook" from Project Renewal to Jarden's operations to provide scale and cost synergies.[9] Franklin and Polk met again in October on Franklin's yacht in Miami, referred to as the "Boat Meeting." Franklin provided some informal advance notice to board members, but did not have approval to meet with Newell or discuss financial parameters of a sale, yet that is what he did:

> Franklin advised Newell's team that Newell's offer for Jarden would have to "start with a six" and would have to include a significant cash component if Newell's goal was to gain control of the combined company. According to Franklin, he arrived at this number based, in part, on his understanding of Jarden's value as determined in connection with the Jostens acquisition which was underway as of the Boat Meeting. He also wanted to state a number he believed Newell had the "ability to pay," and he assumed a price of $70.00 or higher was "laughable." At the time of the Boat Meeting, Jarden's stock was trading in the high $40s. Therefore, by this metric, a price "starting with a six," by any measure, would be a premium for Jarden's

---

[6] *Id.* at *8.
[7] *Id.*
[8] *Id.* at *9.
[9] *Id.*

stockholders. According to Franklin, even if $60 per share undervalued Jarden, Franklin believed Jarden stockholders would reap additional value by sharing in the upside of the Merger with stock in the combined company.[10]

Polk expressed hope that the merger would produce substantial synergies. While the Jarden team was initially more conservative, it also grew excited about the potential synergies.

Within a few days, Franklin briefed the board on the meeting, including the need for an offer to start with a "six."[11] The board supported and encouraged further discussions within those parameters. Franklin contacted his personal banker at Barclays after the Boat Meeting, said he had expressed to Newell he would sell for $60 per share, and asked the banker to develop an "analysis supporting a transaction in the range of $60-69 per share."[12]

As the parties continued discussions, Jarden was closing the Jostens acquisition. On October 14, "Jarden announced it would acquire Jostens and finance the acquisition through an equity offering priced at $49.00 per share and additional debt."[13] The next day, Jarden presented five-year projections to potential lenders reflecting 3.1% net sales growth. The market reacted negatively to the Jostens acquisition. Jarden's stock dropped about 12% over the following two weeks, and

---

[10] *Id.* at *10 (footnotes omitted).
[11] *Id.*
[12] *Id.* Jarden formally engaged Barclays Capital Inc. in November 2015.
[13] *Id.* at *11.

analysts reduced their price targets. To project confidence, Jarden's board approved a $50 million stock buyback capped at $49.00 per share. Jarden repurchased stock over two days, averaging $45.96 per share on the first, and $48.05 per share on the second.

On October 15, Franklin had Jarden enter into a mutual confidentiality and standstill agreement with Newell. Without board authorization, the parties began due diligence and continued negotiations on deal components, including Franklin's idea of Jarden representatives taking seats on the post-merger board.

On October 22, Franklin and two other Jarden executives, Ian Ashken and James Lillie, met with Newell representatives and shared nonpublic information, including a set of three-year financial projections that forecast 5% revenue growth—the high end of Jarden's historic guidance range of 3% to 5%.[14] At trial, Lillie justified the 5% target because it was a "round number[]."[15] Jarden, however, internally projected growth "in the fours."[16] And because Newell recognized the

---

[14] As the court found, "Jarden had set the market standard for average annual revenue growth within the 3% to 5% range," which Jarden intended to reflect its organic growth. *Id.* at *12. Jarden also included revenue from "tuck-in" acquisitions, where its portfolio companies acquired a target, although public holding companies generally do not include tuck-in acquisitions as organic growth. Regardless, the court found that even excluding such acquisitions Jarden generally performed within its target growth range.

[15] *Id.* (alteration in original).

[16] *Id.*

8

aggressiveness of these numbers, it "determined that it was best to stick with the 3.1% growth projections as stated" to potential lenders for the Jostens acquisition.[17]

On October 28, the board held its first formal meeting to discuss a potential Newell transaction. There was no discussion of a pre-signing market check. Instead, the board directed that negotiations continue with Newell. In November, when Barclays asked Jarden to extend projections to 2020, Jarden instructed it to continue to use the 5% growth rate (the "November Projections"). Barclays used the November Projections to analyze the transaction and for its fairness opinion.

Newell retained Goldman Sachs and Bain & Company as additional financial advisors. Bain initially assessed Jarden's historic organic growth rate, excluding tuck-in acquisitions, at 3.5% at most, and later estimated projected potential synergies of $700-800 million. Centerview projected potential synergies of $500-$900 million. When diligence revealed that almost all of Jarden's acquisitions had been left standalone, Newell saw a substantial opportunity to replicate Project Renewal's success with Jarden's operating company structure.

Despite the higher estimates of potential synergies, Newell structured the deal based on $500 million in estimated annual cost synergies, which priced Jarden at $57-$61 per share. After board authorization, Newell offered $57 per share, with

---

[17] *Id.* Also at the October 22 meeting, without board authorization, Newell and Franklin began discussing specifics about change-in-control payments due to Franklin, Ashken, and Lillie.

9

$20 in cash plus a fixed exchange ratio of Newell shares. The offer represented an 18% premium over Jarden's then-current share price.[18] Jarden's board rejected the offer and authorized Franklin to seek a higher offer, but not to make a counteroffer. When the negotiating teams met on November 16, however, Franklin made a counteroffer of $63 per share with $21 in cash. Newell balked, the meeting ended, and the deal almost died.

Then on November 21, Newell came back with an offer of $21 in cash and target price of $60 per share. The next day, Jarden's board met, decided to accept the offer, and granted Newell exclusivity during the confirmatory due diligence period. Franklin believed that the offer, a 13.5x EBITDA multiple, was the highest multiple Jarden would ever trade. And it had just acquired Jostens at a 7.5x EBITDA multiple. The board also found that Jarden stockholders stood to benefit from synergies above the $500 million by retaining shares in the combined company. The board's exclusivity agreement disabled any market check. The board thought that Newell was the best and most likely acquirer, and no other companies had the same fit or ability to pay.

When the parties met to hammer out the details, they understood that Newell's management team would continue to lead the combined companies. Newell wanted

---

[18] The offer also included an expectation that Franklin would join the post-merger board of directors and was open to increasing the size of the board for additional directors.

Franklin on the board as a sign of confidence to the market. Franklin, Ashken, and Lillie also agreed to a consulting agreement with non-competition covenants in exchange for a $4 million annual fee for three years.

News of the deal leaked on December 7, but not who was buying whom or the deal price. Newell's stock price increased, Jarden's stock price decreased, and they renegotiated the stock-for-stock ratio.[19] Jarden's board met on December 10 to discuss the negotiations and whether the transaction still made sense. The minutes emphasized that Jarden was not for sale and the sole alternative was remaining independent. The board discussed the change-of-control payments for the first time. And the board's compensation committee eventually recommended that the board award Franklin, Ashken, and Lillie their 2017 and 2018 restricted stock awards, which would not have been due under the existing employment agreements.

At the next Jarden board meeting on December 13, Barclays presented the revised deal terms and an oral opinion that the merger was fair from a financial point of view. The board approved the merger. It also approved the separation agreements and amendments to the employment agreements with Franklin, Ashken, and Lillie. On the same day, the Newell board met, considered financial projections assuming a 3.1% revenue growth rate, and approved the deal.

---

[19] Had the parties kept the original ratio, Newell would have paid $120 million more at an implied price of $61.73 per share. *See* Opening Br. at 10–11; Answering Br. at 17 n.91.

The parties announced the merger on December 14, 2015. Jarden's stock price jumped, and it eventually converged on the deal price by the time of closing. Newell's stock price declined by nearly 7%. According to the court, after accounting for market fluctuations, Newell's stock price reflected a neutral market response, at best.

In early 2016, Jarden reported its 2015 year-end results, which included considerable losses to operating income and net income compared to recent years; first quarter 2016 results, which were weak; and the final 2016 budget, which was adjusted downward due to a decline in year-end revenue. During March and April, before the merger closed, Jarden prepared updated projections for 2016-2020 (the "April Projections") that, in part, forecast a 4.4% compound annual revenue growth rate. Jarden and Newell stockholders approved the merger on April 15, 2016. As of the closing, the mix of cash and stock valued Jarden at $59.21 per share.

Petitioners sought appraisal. The Court of Chancery held a four-day trial with twenty-five fact witnesses and three expert witnesses. For the petitioners, Dr. Mark Zmijewski testified and presented a comparable companies analysis and a discounted cash flow analysis. He relied primarily on his comparable companies analysis to support a fair value of $71.35 per share on the merger date. For Jarden, Dr. Glenn Hubbard testified and considered market evidence of Jarden's unaffected stock price and the merger price less synergies. He also examined comparable

companies and presented a DCF analysis. Ultimately, he concluded that Jarden's fair value on the merger date was $48.01 per share based on his DCF analysis.

The Court of Chancery stayed the case until our Court issued the decision in *Verition Partners Master Fund Ltd. v. Aruba Networks, Inc.*[20] After considering the *Aruba* decision and receiving further submissions from the parties, the Court of Chancery found the fair value of each share of Jarden stock on the closing date of the merger at $48.31 using Jarden's unaffected market price.

First, the court offered its "takeaway" from our recent decisions in *DFC Global Corp. v. Muirfield Value Partners, L.P.*,[21] *Dell, Inc. v. Magnetar Global Event Driven Master Fund Ltd*,[22] and *Aruba*—that the Court of Chancery follow the appraisal statute's directive to consider "all relevant factors" and to base its fair value decision on the record made by the parties at trial.[23] Second, the court decided not to use the deal price less synergies as a reliable indicator of fair value. Although "mindful of our Supreme Court's guidance in *Dell*" that a "robust sale process" can discover a corporation's fair value, the court held that the Jarden sale process "raise[d] concerns" and "left much to be desired."[24] As the court held, Jarden's CEO acted with "little to no oversight by the Board" and volunteered "a price range the

---

[20] 210 A.3d 128 (Del. 2019).
[21] 172 A.3d 346 (Del. 2017).
[22] 177 A.3d 1 (Del. 2017).
[23] *Jarden*, 2019 WL 3244085, at *2.
[24] *Id.* at *3, *23–24.

Board would accept to sell the Company before negotiations began in earnest."[25] Also critical, according to the court, was the lack of a pre-signing or post-signing market check and "the difficulty in assessing the extent to which Newell ceded synergies to Jarden in the Merger."[26] Further, there was no dispute that "synergies were realized in the merger, as one would expect when two strategic partners combine."[27] After reviewing the evidence, the court decided to "place less weight on this market-based valuation approach in this case because the sales process was not well-conceived or well-executed and the expert analysis of the transaction synergies raised more questions than it answered."[28]

Third, the court rejected the petitioners' comparable companies analysis of $71.35 per share. The court found the credibility of this analysis depended "on the quality of the comparables."[29] The court concluded that "Jarden had no reliable comparables," in part because the petitioners' expert failed to support his selection of peer group companies.[30] Without a valid peer set, the court did not give the analysis any weight.

[25] *Id.* at *3.
[26] *Id.* at *25.
[27] *Id.*
[28] *Id.* at *26.
[29] *Id.* at *3.
[30] *Id.* at *3, *34–35.

Fourth, the court refused to adopt either parties' DCF models because of the wildly divergent fair value conclusions. In the DCF analyses, Dr. Zmijewski valued Jarden between $70.36 and $70.40 per share, while Dr. Hubbard valued Jarden at $48.01 per share.[31] The court noted that similar valuations indicated upwards of a $5 billion difference in market value.[32] And the experts' inputs used to populate their DCF models were similarly divergent. For instance, Dr. Zmijewski advocated a 4.9% terminal investment rate, while Dr. Hubbard advocated a 33.9% rate.[33] That disagreement accounted for 87% of the difference in their DCF values.[34] Instead of relying exclusively on either expert's analysis, the court selected its own inputs that led to a DCF fair value of $48.13 per share—a result it ultimately chose not to rely on as a primary source for its fair value award.

After expressing significant discomfort with the comparable companies and DCF valuation models, the court decided to use Jarden's unaffected stock price—$48.31 per share—as the best evidence of Jarden's fair value. Relying in part on an

---

[31] *Id.* at *36.

[32] *Id.* at *1 (noting that "[t]o put the disparity in context, Dr. Zmijewski's valuation [of $71.35 per share] implies that the market mispriced Jarden by over $5 billion," when compared to the share price of $48.31).

[33] The terminal investment rate is the amount of investment needed to support the terminal growth rate in a discounted cash flow analysis. The Court of Chancery used the convergence model, which is "a reflection of the widely-accepted assumption that for companies in highly competitive industries with no competitive advantages, value-creating investment opportunities will be exhausted over a discrete forecast period, and beyond that point, any additional growth will be value-neutral" leading to the "return on new investment in perpetuity [converging] to the company's cost of capital." *In re John Q. Hammons Hotels Inc. S'holder Litig.*, 2011 WL 227634, at *4 n.16 (Del. Ch. Jan. 14, 2011).

[34] *Jarden*, 2019 WL 3244085, at *39.

event study performed by Jarden's expert, the court found that the market for Jarden stock was informationally efficient, meaning the corporation's stock price quickly reflected publicly available information. Further, according to the court, the parties did not have material nonpublic information that would not be reflected in Jarden's unaffected stock price. The court also found that minority and conglomerate discounts should not be applied. And the unaffected market price was not stale as of the merger date because the evidence showed that Jarden's financial prospects worsened between the unaffected trading date and closing the merger.

In a motion for reargument, the petitioners pointed out errors in the court's DCF analysis. According to the petitioners, if the court had calculated properly its DCF valuation using the court's factual determinations, it would have arrived at a fair value between $61.59 and $64.01 per share. The court adopted all of the petitioners' proposed corrections. But the court also adopted Jarden's request to change its DCF model's terminal investment rate because the court's prior DCF model "improperly depart[ed] from" the principle which it endorsed—that return on new invested capital should equal the company's weighted average cost of capital.[35] After all the changes, the court calculated a revised DCF value of $48.23 per share on the merger closing date. Although the court did not rely on its DCF analysis, the

---

[35] *In re Appraisal of Jarden Corp.*, 2019 WL 4464636, at *3 (Del. Ch. Sept. 16, 2019).

16

court remarked that the revised DCF value corroborated its $48.31 per share fair value award.

## II.

In an appraisal action, the Court of Chancery "shall determine the fair value of the shares exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation" plus interest.[36] Fair value "is a jurisprudential, rather than purely economic, construct," meaning fair value is a law-created valuation method that excludes elements of value that would normally be captured in economic models.[37] Under the appraisal statute, when "determining such fair value, the Court shall take into account all relevant factors."[38] The court's task is "to value what has been taken from the shareholder."[39] The court must assess the fair value of each share of stock "on the closing date of the merger" and determine the value of the pre-merger corporation as a going concern.[40] "[B]oth sides have the burden of proving their respective valuation positions by a preponderance of [the] evidence."[41] In the end, the trial judge must determine fair value,[42] and "fair value

---

[36] 8 *Del. C.* § 262(h).
[37] *DFC*, 172 A.3d at 367 ("[T]he definition of fair value used in appraisal cases is a jurisprudential concept that has certain nuances that neither an economist nor market participant would usually consider when either valuing a minority block of shares or a public company as a whole.").
[38] 8 *Del. C.* § 262(h).
[39] *Aruba*, 210 A.3d at 132 (quoting *Cavalier Oil Corp. v. Hartnett*, 564 A.2d 1137, 1144 (Del. 1989)).
[40] *Dell*, 177 A.3d at 20.
[41] *M.G. Bancorporation, Inc. v. Le Beau*, 737 A.2d 513, 520 (Del. 1999).
[42] *Dell*, 177 A.3d at 20.

17

is just that, 'fair.' It does not mean the highest possible price that a company might have sold for."[43]

On appeal, the petitioners have jettisoned their lead valuation argument in the Court of Chancery—a comparable companies analysis of $71.35 per share. They now argue that the court erred by using Jarden's unaffected market price when deal price or discounted cash flow models offered better fair value alternatives. According to the petitioners, the court erred as a matter of law "because it ignore[d] the long-recognized principle in Delaware law, reinforced in *Aruba*, that stock price does not equal fair value."[44] Petitioners also argue that the Court of Chancery abused its discretion by using unaffected market price when the deal price resulted from negotiations by insiders who had access to material confidential information about Jarden's financial outlook and were incentivized to engage in price discovery. Further, the petitioners assert that the court erred by ignoring the court's DCF analysis which, except for the court's erroneous change on reargument of the terminal investment rate, would have led to a fair value range of $61.59-$64.01 per share. They also argue that the court ignored market-based evidence of Jarden's value, contemporaneous analyst reports, and valuation experts. Underlying all of their arguments is the claim that the court should have at least treated the deal price

---

[43] *DFC*, 172 A.3d at 370.
[44] Opening Br. at 3.

as a valuation floor instead of rejecting it outright because of the flawed negotiation process.

Jarden counters that the petitioners relied primarily on a comparable companies analysis but did not come forward with comparable companies that could be adjusted reliably, failed to respond meaningfully to Jarden's market-based analysis, and refused to accept the court's ultimate conclusion that the DCF analyses could not be trusted because of the wildly divergent fair value conclusions. It argues that the record supports the efficiency and reliability of the unaffected market price. Unlike in *Aruba*, says Jarden, there was no material nonpublic information that would impact the market's ability to assess Jarden's value. Further, they contend that the fair value should be below the deal price because the court found the deal price included synergies captured by Jarden. Otherwise, Jarden argues the court considered and rejected the petitioners' arguments and grounded its decision in the record.

The arguments on appeal coalesce around three themes—the court erred as a matter of law and abused its discretion by relying on unaffected market price; the court should have treated the deal price as a fair value floor; and the court constructed its own flawed DCF model to corroborate its fair value. We review errors of law de novo.[45] We review a statutory appraisal award for abuse of discretion and "grant

---

[45] *SmithKline Beecham Pharm. Co. v. Merck & Co., Inc.*, 766 A.2d 442, 447 (Del. 2000).

significant deference to the factual findings of the trial court."[46]  "We defer to the trial court's fair value determination if it has a 'reasonable basis in the record and in accepted financial principles relevant to determining the value of corporations and their stock.'"[47]

## A.

Turning to the first ground for error—the Court of Chancery's reliance on Jarden's unaffected market price for fair value—the petitioners argue that our recent *Aruba* decision foreclosed as a matter of law the court's use of unaffected market price to support fair value.[48]  The Court of Chancery recognized correctly, however, neither *Aruba* nor our other recent appraisal decisions ruled out using any recognized valuation methods to support fair value.

Our *Aruba* decision followed closely on the heels of two other important Supreme Court appraisal decisions—*DFC Global Corp.* and *Dell*.  In *DFC*, we reviewed the appraisal statute and how valuation methods evolved following the Court's decision in *Weinberger v. UOP, Inc.*[49]  The thrust of the *DFC* decision took issue with the Court of Chancery's reasoning for rejecting deal price as relevant to fair value.  We also questioned inputs made by the court in its DCF analysis.

---

[46] *DFC*, 172 A.3d at 363.
[47] *Dell*, 177 A.3d at 5–6 (quoting *DFC*, 172 A.3d at 348–49).
[48] Opening Br. at 3 ("The trial court's reliance on Jarden's trading price on December 4, 2015, constitutes legal error because it ignores the long-recognized principle in Delaware law, reinforced in *Aruba*, that stock price does not equal fair value.").
[49] 457 A.2d 701 (Del. 1983).

Although we refused to adopt a presumption in appraisal proceedings favoring deal price for fair value, we noted that "our refusal to craft a statutory presumption . . . does not in any way signal our ignorance to the economic reality that the sale value resulting from a robust market check will often be the most reliable evidence of fair value" and "second-guessing the value arrived upon by the collective views of many sophisticated parties with a real stake in the matter is hazardous."[50] Focusing on *Weinberger* and its end of the Delaware Block Method of valuation, we commented on the relevance of a stock's unaffected market price to fair value:

> That *Weinberger* got rid of the Delaware Block Method does not mean that the pre-transaction trading price of a public company's shares is not relevant to its fair value in appraisal, particularly given the focus on going concern value. Historically, appraisal actions have had the most utility when private companies are being acquired or for public companies subject to a conflicted buyout, situations where market prices are either unavailable altogether or far less useful. When, as here, the company had no conflicts related to the transaction, a deep base of public shareholders, and highly active trading, the price at which its shares trade is informative of fair value, as that value reflects the judgments of many stockholders about the company's future prospects, based on public filings, industry information, and research conducted by equity analysts.[51]

In *Dell*, we found that the Court of Chancery erred when it assigned no weight to market value or deal price as part of its valuation analysis. Once again, our Court emphasized that the court must "take into account all relevant factors" and "give fair

---

[50] *DFC*, 172 A.3d at 366.
[51] *Id*. at 373 (footnotes omitted).

consideration to 'proof of value by any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court.'"[52] Although we cautioned that, in a given case, the market is not always the best indicator of value, and it need not always be accorded some weight, we believed that, on the record before the court, "the market-based indicators of value—both Dell's stock price and the deal price—have substantial probative value."[53]

And finally, in *Aruba*, we emphasized the "considerable weight" a court should give to the deal price "absent deficiencies in the deal process" because, for example, "a buyer in possession of material nonpublic information about the seller is in a strong position (and is uniquely incentivized) to properly value the seller when agreeing to buy the company at a particular deal price."[54] We also recognized, however, that "when a market was informationally efficient in the sense that 'the market's digestion and assessment of all publicly available information concerning [the Company] [is] quickly impounded into the Company's stock price,' the market price is likely to be more informative of fundamental value."[55] And how informative

---

[52] *Dell*, 177 A.3d at 21 (quoting *Weinberger*, 457 A.2d at 713).
[53] *Id*. at 35.
[54] *Aruba*, 210 A.3d at 137.
[55] *Id.* (quoting *Dell*, 177 A.3d at 7) (alterations in original); *DFC*, 172 A.3d at 349 ("Like any factor relevant to a company's future performance, the market's collective judgment of the effect of regulatory risk may turn out to be wrong, but established corporate finance theories suggest that the collective judgment of the many is more likely to be accurate than any individual's guess."); *Dell*, 177 A.3d at 35 (finding that the "market-based indicator" of "Dell's stock price" had "substantial probative value").

of fundamental value an informationally efficient market is depends, at least in part, on the extent of material nonpublic information.[56] We also noted that it is a "traditional Delaware view" that in some cases "the price a stock trades at in an efficient market is an important indicator of its economic value" and "should be given weight."[57]

In *DFC*, *Dell*, and *Aruba* we did not, as a matter of law, rule out any recognized financial measurement of fair value. Instead, we remained true to the appraisal statute's command that the court consider "all relevant factors" in its fair value determination. Although subject to academic debate, we have also recognized the efficient capital markets hypothesis in appraisal cases.[58] The Vice Chancellor got the "takeaway" exactly right from our recent appraisal decisions: "[w]hat is necessary in any particular [appraisal] case [] is for the Court of Chancery to explain

---

[56] *Aruba*, 210 A.3d at 138 n.53 (explaining that when markets reflect all information, rather than just publicly available information, they are "more likely to reflect fundamental value"); *see* Jonathan Macey & Joshua Mitts, *Asking the Right Question: The Statutory Right of Appraisal and Efficient Markets*, 74 Bus. Law. 1015, 1021 (2019) ("[B]ecause informational efficiency and fundamental efficiency are not the same thing, the share price of a company's stock, even when informationally efficient, may diverge occasionally from the stock's fundamentally efficient price. This divergence occurs, however, only when and to the extent that there is material nonpublic information that is not impounded in a company's share prices.").

[57] *Aruba*, 210 A.3d at 138.

[58] *Compare, e.g.*, Macey & Mitts, *supra* note 57, at 1017 ("Delaware Courts are correct in affording primacy to the [efficient capital market hypothesis] in valuation cases. In particular, . . . the ECMH is vastly superior to alternative, subjective valuation methodologies, such as [discounted cash flow] analysis."), *with* Lynn A. Stout, *The Mechanisms of Market Inefficiency: An Introduction to the New Finance*, 28 J. Corp. L. 635 (2003) (exploring weaknesses of the efficient capital market hypothesis).

its [fair value calculus] in a manner that is grounded in the record before it."[59]  Or, as we said in *Dell*:

> In the end, after this analysis of the relevant factors, "[i]n some cases, it may be that a single valuation metric is the most reliable evidence of fair value and that giving weight to another factor will do nothing but distort that best estimate.  In other cases, it may be necessary to consider two or more factors."  Or, in still others, the court might apportion weight among a variety of methodologies.  But, whatever route it chooses, the trial court must justify its methodology (or methodologies) according to the facts of the case and relevant, accepted financial principles.[60]

## B.

The Court of Chancery found, and the petitioners agree, that Jarden stock traded in a semi-strong efficient market, meaning the market quickly assimilated all publicly available information into Jarden's stock price.[61]  The court considered whether there was sufficient information asymmetry between the market and insiders to render the unaffected market price unreliable.  Based on an event study by Dr. Hubbard and the market's reaction to Jarden's November Projections after their disclosure in its March proxy, the court found it unlikely that there was material nonpublic information not incorporated by the market's estimate of Jarden's value.

---

[59] *Jarden*, 2019 WL 3244085, at *2 (quoting *DFC*, 172 A.3d at 388) (alterations in original).
[60] *Dell*, 177 A.3d at 22 (quoting *DFC*, 172 A.3d at 387–88) (footnotes omitted).
[61] *Aruba*, 210 A.3d at 138 n.53.

Thus, the court found it reasonable to rely on Jarden's unaffected market price for fair value.[62]

On appeal, the petitioners challenge the absence of material nonpublic information, pointing to evidence in the record that, during the negotiations, the parties designated many documents confidential under a non-disclosure agreement.[63] They also claim that Jarden was difficult to value due to what they claim was limited public information about the corporation coupled with its many acquisitions. And they contend that Newell responded positively to a "significant amount of material, nonpublic information" during due diligence.[64] Thus, according to the petitioners, the court should not have relied on Jarden's unaffected market price when the market lacked material nonpublic information and reacted strongly when it eventually received that information.

Experience tells us that sophisticated buyers and sellers typically exchange material confidential information in deal negotiations. The buyer also usually has access to insiders, nonpublic projections, and the ability to ask questions and seek explanations. Thus, the unaffected market price is not always a better reflection of

---

[62] The court also found there were no conglomerate or minority discounts, and the unaffected market price was not stale as of the merger date. The petitioners do not challenge those findings.
[63] According to the petitioners, more than 143,000 documents were labelled "confidential" or "highly confidential," meaning Jarden had "a good faith belief that the material contained non-public, commercially sensitive information." Opening Br. at 27. As they argue further, Newell was more incentivized to engage in price discovery than an ordinary trader because it was purchasing the entire company. *Id*. at 27–28.
[64] *Id.* at 27.

fair value than the deal price negotiated by those with better access to the corporation and its advisors.

But in this case, we are satisfied that, on the record before it, the court did not abuse its discretion when it found that the market did not lack material nonpublic information about Jarden's financial prospects. The only specific nonpublic information the petitioners point to are the November Projections, which were not public until the March 2016 joint proxy.[65] The court assessed the materiality of the November Projections by comparing Jarden management's projections and those from market analysts.[66] The court relied on Dr. Hubbard's opinion that characterized the difference in projections as a "divergence of *opinion* about Jarden's prospects, not a material difference in available *information*."[67]

To test whether the difference of opinion represented a difference in available information, Dr. Hubbard conducted an event study. Dr. Hubbard expected that if the November Projections contained information not previously reflected in the market price, Jarden's and Newell's stock price should react to the new information when it was disclosed in the March proxy. "In other words, if the November

---

[65] *Id.* at 29. In their reply brief, the petitioners mention briefly "Jarden's February earning release reflecting better-than-expected performance for FY2015." Reply Br. at 3. Because there is no further support for the argument and it was only raised in reply, we do not consider it.

[66] The court also considered the correlation between the federal risk-free rate and Jarden's stock price and concluded that it did not support any information asymmetry. *Jarden*, 2019 WL 3244085, at *29.

[67] App. to Answering Br. at B563; *Jarden*, 2019 WL 3244085, at *30.

26

Projections justified more value[,] . . . then Newell's stock price should have increased substantially [when Jarden disclosed the projections] to reflect that Newell was acquiring Jarden at less than fair value."[68]

As Dr. Hubbard testified and the court found, however, "that is not what happened."[69] Instead, Jarden's stock price rose and Newell's dropped. The court accepted Dr. Hubbard's conclusion that the difference between management's and analysts' projections "was not attributable to unreasonable market pessimism, but instead showed that market analysts had more accurately estimated Jarden's 2016 outlook than Jarden's management (who may have been motivated by factors other than actual anticipated results when making their forecasts)."[70] Based on the record before it, the court could find that the "market was well informed and the Unaffected Market Price reflects all material information."[71]

The petitioners take issue with the event study because the movement in stock prices could have been attributable to other factors. As they argue, the proxy disclosed integration risks, stockholders associated those risks with Jarden, and parsing the effects of a single piece of information was impossible. The petitioners also claim that Jarden's stock price tracked Newell's because Newell stock made up a substantial part of the merger consideration. While the precise consequences of

---

[68] *Jarden*, 2019 WL 3244085, at *30.
[69] *Id.*; App. to Answering Br. at B564.
[70] *Jarden*, 2019 WL 3244085, at *30; App. to Answering Br. at B566.
[71] *Jarden*, 2019 WL 3244085, at *30.

these alleged facts are unclear, according to the petitioners the court abused its discretion by ignoring these facts.

The court did not ignore these facts. The court considered the arguments that "Jarden's stock price was tethered to Newell" and that integration risks affected Jarden.[72] The court found it "not supported by the credible evidence," and while "Newell's stockholders may have reacted to that [integration] risk, . . . there is no evidence that Jarden's stockholders, or the market, associated that risk with Jarden."[73] In the end, the court did not abuse its discretion when it found Dr. Hubbard's event study reliable even after considering the petitioners' "tethering argument."

## C.

At the petitioners' urging, the Court of Chancery did not rely on the deal price to find fair value because the negotiation process "left much to be desired."[74] According to the court, Franklin "may well have set an artificial ceiling on what Newell was willing to pay," and "flaws in the sale process" undermined the usefulness of the deal price as an indicator of fair value.[75]

Having successfully undermined the reliability of the deal price in the Court of Chancery, the petitioners now claim on appeal that the deal price should have at

---

[72] *Id.* at *30 n.373.
[73] *Id.* (citing Dr. Hubbard's testimony and reports).
[74] *Id.* at *3.
[75] *Id.* at *24–25.

least acted as a floor for the fair value of Jarden stock. As they argue, *DFC*, *Dell*, and *Aruba* require that the court give heavy weight to the deal price. Because a better process would have resulted in a higher deal price, and, according to the petitioners, Jarden failed to prove synergies, they contend the deal price is "logically the minimum for any fair value determination."[76]

The petitioners' arguments have some appeal. It makes sense that if a deal negotiation process is flawed, and the seller's negotiator capped the value under what might be achieved in true arm's length negotiations, the deal price might act as a fair value floor in the absence of synergies. But here, synergies cause us to find the Court of Chancery did not err for failing to treat the deal price as a floor for fair value.

First, by way of background, the petitioners attacked the deal price as an unreliable indicator of fair value because of an imperfect negotiation process. The Court of Chancery agreed with them. In their post-trial briefing, the petitioners argued that "the issue of synergies only need be addressed if the deal 'price was generated by a process that likely provided market value.'"[77] Because "[t]hat

---

[76] Opening Br. at 44–47 (emphasis omitted) (listing other factual findings).
[77] App. to Opening Br. at A1039 (quoting *Merion Capital LP v. BMC Software, Inc.*, 2015 WL 6164771, at *17 (Del. Ch. Oct. 21, 2015)); *see Merion Capital LP*, 2015 WL 6164771, at *17 ("[T]his Court must determine that the price was generated by a process that likely provided market value, and thus is a useful factor to consider in arriving at fair value. Once the Court has made such a determination, the burden is on any party suggesting a deviation from that price . . . .").

precondition has not been met here," the petitioners implied that the court did not need to address the issue of synergies.[78] In their post-*Aruba* briefing, they argued that the deal price should act as a floor, although they continued to argue that "[s]ynergies only become relevant in an appraisal if the deal price" was reliable.[79] We are hard-pressed to fault the court for not looking to the deal price as a floor for fair value when the petitioners told the court that synergies only became relevant if the deal price was reliable. Further, that condition makes some sense—when the deal price is unreliable, the existence and allocation of synergies are likely more difficult to determine.

Second, the Court of Chancery understood that the deal price had to be adjusted for synergies. As we observed in *Dell*, "the court should exclude 'any synergies or other value expected from the merger giving rise to the appraisal proceeding itself.'"[80] The court here found that "[t]here is no dispute here that synergies were realized in the Merger."[81] Capturing the synergies was the "logic for

[78] App. to Opening Br. at A1039 (arguing that, in the case the court looks to the deal price, the sellers did not capture synergies in the deal price).

[79] *Id.* at A1334; *see also In re Appraisal of AOL Inc.*, 2018 WL 1037450, at *10 n.119 (Del. Ch. Feb. 23, 2018) ("Because I do not explicitly give weight to the deal price, I need not address certain related issues, such as the calculation of synergies.").

[80] 177 A.3d at 21 (quoting *Global GT LP v. Golden Telecom, Inc.*, 993 A.2d 497, 507 (Del. Ch. 2010), *aff'd*, 11 A.3d 214 (Del. 2010)).

[81] *Jarden*, 2019 WL 3244085, at *25.

the deal" for Newell.[82]  And the court saw no reason to doubt the accuracy of the

experts' assumption of $500 million in expected synergies.  The court did find it

"less clear" whether Jarden captured the synergies in the deal price.[83]  There was

evidence going both ways.[84]  Additional evidence came from Dr. Hubbard, who

found that Jarden captured the synergies.[85]  The court found that the competing

evidence "stands in equipoise" and "the expert analysis of the transaction synergies

raised more questions than it answered."[86]  In the end, however, the court concluded

that "Jarden stockholders probably did [] receive the value of the synergies that were

created by the deal."[87]  And it was "satisfied from the evidence that the Merger Price

exceeded fair value."[88]

The record supports the court's conclusion that there were synergies in the

deal, and Jarden "probably" captured those synergies in the merger price.  As further

evidence of the court's belief that Jarden captured some of those synergies, the court

---

[82] *Id.*; App. to Opening Br. at A553 (Polk testified that "[w]e wanted as part of—the deal terms, to get control of the company.  Because there was no way that, without our leadership of the change agenda, those synergies were going to be realized.").

[83] *Jarden*, 2019 WL 3244085, at *25.

[84] *See, e.g.*, App. to Opening Br. at A549 (Polk testified that "there's no way you'd pay a premium for anything unless you had the synergies.  So of course that was part of the equation."); *id.* at A2777 (Polk wrote that "if we get the deal done between $60 and $65, we are basically getting the synergies with no value ascribed to them.").

[85] Dr. Hubbard's analysis valued the synergies at $17.43 per Jarden share, which the court noted "line[d] up nicely with the delta between the unaffected market price ($48.31) and the Merger Price ($59.21), indicating that the delta, or premium, represented expected synergies."  *Jarden*, 2019 WL 3244085, at *26; App. to Opening Br. at A5757; App. to Answering Br. at B678.

[86] *Jarden*, 2019 WL 3244085, at *26.

[87] *Id.*

[88] *Id.* at *26 n.324.

assigned a specific number to deal price less synergies. While the basis for the number is a bit uncertain, it falls between two values Dr. Hubbard identified.[89] Regardless, in the end, the court did not give deal price minus synergies any weight in its final fair value award.[90]

D.

The Court of Chancery also looked to other market evidence to support its conclusion that Jarden's unaffected market price represented fair value. According to the petitioners, the other market evidence either did not support the court's analysis, or it pointed in the other direction and the court ignored it. After reviewing the record, however, which contains a mix of valuation ranges supporting either side's valuation position, we find that the court did not abuse its discretion in its review of the conflicting valuations.

First, the petitioners point to market analysts, who they claim had price targets of $58-$65 per share.[91] The court noted that "[m]ore than twenty professional financial analysts followed Jarden" and found "the lack of consensus between Jarden management and third-party analysts' projections" not "evidence of information

---

[89] *Id.* at \*50 (assigning $46.21 as "the most reliable estimate of fair value" under the deal price less synergies approach); App. to Opening Br. at A691 (testifying that $41.78 and $47.21 are possible values). Perhaps the court's number, $46.21, is simply a mistyped $47.21.

[90] *Jarden*, 2019 WL 3244085, at \*50 (awarding only the unaffected market price of $48.31).

[91] Opening Br. at 31 (citing App. to Opening Br. at A3332 (summarizing analyst reports with price targets ranging from $53–$65)).

asymmetry" because of Dr. Hubbard's event study.[92]  While not entirely clear whether the court was referring to the higher price targets, they appear to be another example of a difference in opinion about Jarden's prospects rather than evidence of a difference in raw information.[93]

The petitioners also rely on valuations from financial advisors.[94]  As for Centerview and Goldman, the unaffected market price fell within their valuation ranges.[95]  The petitioners cherry-pick the highest value in those ranges without justifying why that is the only relevant value.[96]  And the petitioners point to Barclays's materials valuing Jarden at $60-$68 per share.[97]  But as Jarden observes, Barclays developed those materials after "Franklin . . . instructed [his personal Barclays banker] to start developing an analysis supporting a transaction in the range of $60-$69 per share."[98]

---

[92] *Jarden*, 2019 WL 3244085, at *5, *30; *see* App. to Answering Br. at B563–66.

[93] *Jarden*, 2019 WL 3244085, at *30.

[94] Opening Br. at 33 (citing Barclay's valuation at $60-$68 per share, Centerview's valuation up to $66.64 per share, and Goldman's valuation up to $68.12 per share).

[95] App. to Opening Br. at A3391 (Centerview presenting a range of $39-67 per share); *id.* at A3347 (Goldman presenting a range of $34.10-$68.12 per share).

[96] Reply Br. at 9 n.46 ("[T]he full range of the financial advisors' DCF values does not negate the fact that each contemplated Jarden's value well above the Deal Price.").

[97] App. to Opening Br. at A1988, A2063 (Barclays' presenting a range of $60-$68 per share).

[98] *Jarden*, 2019 WL 3244085, at *10 (citing the same presentation as the petitioners cite on appeal). The petitioners do not refute that on reply.  Reply Br. at 9 n.46 ("Respondent's argument that Barclay's materials reflecting a range between $60-$68 did not constitute a valuation also necessarily admits that Jarden's financial advisors simply bracketed the deal terms as demanded by Franklin.").

Next, the petitioners rely on valuations from those involved in the negotiations—the parties who negotiated a higher price and management who received additional payments. For the negotiators, the petitioners argue that Newell's opening bid of $57 per share, and Jarden's rejection of that bid, indicate the parties thought Jarden's value was higher than the unaffected market price. But a deal price may be higher than the unaffected market price for reasons other than the seller's going concern value, and Polk testified that Newell paid a premium for control and anticipated synergies.[99] For the compensation received by executives, the petitioners argue that they received "$71.04, $76.11, and $81.69 per share."[100] The record supports the court's view that the increased management compensation could be attributed to amended employment agreements, extended non-compete agreements, and an acceleration of certain restricted stock awards, which do not affect management's valuation of Jarden.[101]

---

[99] App. to Opening Br. at A549 ("[T]here's no way you'd pay a premium for anything unless you had the synergies."); *id.* at A552 ("The deal value assumed $500 million of synergies."); *id.* at A553 ("[O]ne of the deal requirements, from our perspective, was that we have management control. And the logic for why that was so important was because in order to get the synergies, we needed to have management control, because we didn't believe, if they had management control, they would pursue it."); *see DFC*, 172 A.3d at 371 ("[I]t is widely assumed that the sales price in many M & A deals includes a portion of the buyer's expected synergy gains, which is part of the premium the winning buyer must pay to prevail and obtain control.").

[100] Opening Br. at 34.

[101] *Jarden*, 2019 WL 3244085, at *19 n.249; App. to Opening Br. at A5017–18 (Dr. Zmijewski's report finding that the $71-$81 per share received by management is the total amount received, including compensation unrelated to stock ownership, divided by the number of shares held).

Finally, the court supported its fair value award by pointing to Jarden's financing for the Jostens acquisition through a $49 per share equity offering, as well as a stock buyback capped at $49 per share following the market's negative reaction to the Jostens acquisition. The court concluded that Jarden, at the time, believed that the price cap "reflected Jarden's value."[102] And while the court concluded that the buyback effort was "by no means dispositive," it did consider the buyback "persuasive evidence that, . . . both [Jarden] and the market saw Jarden's value well below what [the petitioners] seek here."[103]

The petitioners challenge the court's reliance on the buyback as a fair value indicator, claiming that the court's reliance on the price cap was "factually incorrect" and ignored the opinion of others who thought Jarden was undervalued.[104] They argue the court's use of the buyback to corroborate the unaffected market price "does not make any sense."[105] To the petitioners, the buyback indicates that Jarden's stock was undervalued because the "rationale behind a stock repurchase is the Company's belief that its stock is undervalued."[106]

According to the record, Jarden was coming off a weaker than expected equity raise at $49 per share. And when the market reacted poorly to the Jostens

---

[102] *Jarden*, 2019 WL 3244085, at *31.
[103] *Id.*
[104] Opening Br. at 31.
[105] *Id.* at 34.
[106] *Id.* at 35 (emphasis omitted).

acquisition, Jarden sought to signal confidence to the market by repurchasing shares.[107]  Jarden authorized a buyback with a price cap of $49 because it believed that price reflected Jarden's value and because of the recent equity raise.[108]  Jarden repurchased shares on two days at an average price of $45.96 per share on the first and $48.05 per share on the second.[109]  There are additional reasons for buybacks, like signaling confidence, beyond the petitioners' assertion that the only rationale for buyback is a belief that the stock is undervalued.  Further, even if it was indicative of such a belief, a price cap of $49 per share could also indicate where that belief ends and the board believes the company is valued more accurately.[110]

## E.

Finally, the petitioners contend that, after reargument, the Court of Chancery should not have changed the terminal investment rate ("TIR") in its DCF model. The change is meaningful because, as petitioners claim, after the court corrected other inputs to the model, the TIR change reduced the final DCF value from $61.59-

---

[107] *See* App. to Opening Br. at A4250 (Franklin stated that there were "dual reason[s]" for buying back shares, in part because it was undervalued in the mid-$40s, and in part because "after the announcement of the Jostens transaction, we wanted to show the market that we on the management front and the company's front thought the reaction from the market was wrong.").

[108] App. to Opening Br. at A448 (Franklin testified that "we were buyers up to 49 [dollars per share], which we considered full value at the time."); *id.* (Franklin testified "[w]hy buy higher than you'd just done a stock offering at 49 a few weeks prior?  It made no sense.").

[109] *Jarden*, 2019 WL 3244085, at *31; App. to Answering Br. at B252.

[110] *See* App. to Opening Br. at A4249–50 (Franklin explained that when the board decided to repurchase shares, in part because they thought the market undervalued it, the price was "44, 45; something like that.  And I can't remember why, but they moved up as we went into the buyback program. . . . We got a little unlucky in that regard. . . . So ideally we would have liked to still bought them at 44, 45.").

$64.01 per share to $48.23 per share—a number that lines up with Jarden's unaffected market price.

To review the sequence of events, the parties' experts prepared DCF analyses to estimate Jarden's value. Although both experts agreed on some model inputs, not surprisingly they differed on how Jarden would perform in the terminal period, where over 80% of value resided.[111] As Dr. Hubbard described, estimating the value of the terminal period requires "a sense of what terminal period free cash flows are, the investments needed to sustain the free cash flow, the growth of the firm, and, of course, its cost of capital."[112] The TIR is the amount of investment at the terminal period required to support the projected growth during the terminal period.[113]

At trial, Dr. Zmijewski's approach aligned, in concept, with the Bradley-Jarrell Plowback Formula to calculate a 4.9% TIR.[114] That model posits that the rate of investment must be measured by what is required to drive real growth, meaning growth over inflation. As Jarden's growth steadied out and slowed over time, the theory goes, Jarden required less capital expenditure to drive real growth because a greater percentage of its overall growth is driven by inflation and other economic

[111] *Jarden*, 2019 WL 3244085, at *37 n.430.
[112] App. to Opening Br. at A678.
[113] *Id.* at A679; *see In re Appraisal of PetSmart*, 2017 WL 2303599, at *25 (Del. Ch. May 26, 2017) ("[The expert] used a model out of a McKinsey & Co. textbook to calculate the amount of investment necessary at the terminal period to support the projected growth during the terminal period.").
[114] As the court noted, Dr. Zmijewski only advocated implicitly for a 4.9% TIR.

factors.[115]  According to Dr. Zmijewski, Jarden, as a steady-state corporation, should expect lower growth in the terminal period and thus a much lower TIR.[116]

Dr. Hubbard calculated a 33.9% TIR based on a formula attributed to McKinsey & Co.  The Court of Chancery has accepted the McKinsey formula in other cases, sometimes referring to it as a convergence theory.[117]  The McKinsey formula derives the TIR by dividing the terminal growth rate by the return on new invested capital ("RONIC").  It posits that a company's RONIC converges towards its weighted average cost of capital ("WACC") over time because corporations in competitive industries will not continue to have high and rising returns on invested capital ("ROIC").[118]  To put his calculated rate in context, Dr. Hubbard identified Jarden's average historic investment rate over the previous six years as 26.9%.[119]

Dr. Hubbard testified that he used the McKinsey formula because it is the superior of "multiple approaches one can use for estimating the terminal investment

---

[115] *Jarden*, 2019 WL 3244085, at *40.

[116] *Id.*

[117] *See PetSmart*, 2017 WL 2303599, at *39 ("[The expert's] formula demonstrates that PetSmart's return on invested capital will converge toward its cost of capital, a theory this court has repeatedly cited with approval."); *John Q. Hammons Hotels*, 2011 WL 227634, at *4 n.16 ("The Convergence Model is a reflection of the widely-accepted assumption that for companies in highly competitive industries with no competitive advantages, value-creating investment opportunities will be exhausted over a discrete forecast period, and beyond that point, any additional growth will be value-neutral.  As a result, return on new investment in perpetuity will converge to the company's cost of capital.") (citations omitted).

[118] *Jarden*, 2019 WL 3244085, at *40, *40 n.478; App. to Opening Br. at A682, A5724–25.

[119] App. to Answering Br. at B543–46.  Dr. Hubbard testified that he included the graph of historical rates in his rebuttal report "to respond to something Professor Zmijewski raised," and it "had nothing to do with [his] model" because "the past doesn't matter."  App. to Opening Br. at A713.

rate."[120] He also relied on it because "it matches the economic precepts . . . of being more rigorous about quantifying the link between growth and investment, that growth is not free, and linked to the return on capital."[121]

Dr. Zmijewski criticized Dr. Hubbard for assuming that new investments as of 2021 would not create any value, for excluding certain expenditures from investments, for using an accounting definition for net investment, and for using accounting rates of return rather than economic rates of return to calculate WACC.[122] Dr. Hubbard responded that he did account for certain kinds of investment.[123] And when pressed on whether the McKinsey formula undervalued Jarden, Dr. Hubbard acknowledged that it can undervalue some businesses, but rejected that it did so with Jarden.[124]

The court rejected Dr. Zmijewski's TIR as too low because "it unreasonably assumes rising ROIC for more than 40 years into the Terminal Period, unreasonably assumes all new investment in the Terminal Period will be comprised entirely of

---

[120] App. to Opening Br. at A679–80 (testifying that the formula is applicable, "generally accepted in the fields of finance and economics," and supported by additional treatises).

[121] *Id*. at A679.

[122] *Id*. at A368–69.

[123] *Id*. at A682.

[124] *Id.* at A717 (testifying that the McKinsey formula undervalues "some businesses," and while Jarden is "a consumer products company," it is "not Coke or Pepsi, whose rates of return are far below what [the petitioners'] expert estimates"); *id.* at A731 ("The Coke is obviously an iconic company with brands. It is not a company that you can earn a competitive return, which is why McKinsey selected it. . . . So this is the kind of company that [the petitioner's counsel] was highlighting as exceptional. It is exceptional, but it's not so profitable as the company that Professor Zmijewski modeled for your benefit.").

working capital, and is based on a methodology that conflicts with the valuation goal of striking a balance between investment and growth."[125]  Instead, the court found Dr. Hubbard's use of the McKinsey formula credible and supported by valuation treatises, but also noted that Dr. Hubbard's "relatively high TIR" and his use of six years of Jarden's historic investment rates, instead of five years like that used for the terminal growth rate, raised "yellow flags" because the sixth year was an outlier— Jarden's five-year average historic investment rate was only 21.6%.[126]  The court decided to split the difference between Dr. Hubbard's TIR of 33.9% and the five-year historic rate of 21.6%, landing at 27.75%.  According to the court, its final TIR reflected Jarden's historical investment rate but accounted for a slight increase to accommodate sustained growth in the terminal period.[127]

On reargument, the petitioners pointed out errors in the court's DCF inputs. In response, Jarden argued that the court's TIR selection, which implied a RONIC higher than Jarden's WACC, contradicted the court's acceptance of the McKinsey formula, which derives a TIR by setting RONIC equal to the WACC.[128]  The court

---

[125] *Jarden*, 2019 WL 3244085, at *41.
[126] *Id*.
[127] *Id.*
[128] App. to Answering Br. at B91 (Dr. Hubbard, in an affidavit attached to Jarden's reargument response, stated that the court's "27.75 percent terminal investment rate and its 3.1 percent terminal growth rate imply a *RONIC* of 11.2 percent.  On the one hand, with a 6.9 percent cost of capital, this *RONIC* is 4.2 percent above the cost of capital.  On the other hand, the Opinion cited my testimony that 'in competitive industries, the return on new invested capital should equal the company's WACC' as credible and supported by the valuation treatises.  These two views are in tension.") (footnotes omitted).

adopted all of the petitioners' corrections to its DCF inputs, and also adopted Jarden's TIR correction by revising the RONIC to equal the WACC, which had the effect of changing its 27.75% TIR to 42.5%. According to the court, its original TIR analysis did not make sense because it departed from the McKinsey formula and ignored its premise that the RONIC equals the company's WACC. After all the adjustments, the revised DCF value was $48.23 per share.

On appeal, other than impugning the court's motives for making the TIR change, the petitioners raise a substantive issue—whether the court erred by adopting the McKinsey formula and then failed to justify changing the value on reargument.[129] According to the petitioners, the court should not have adopted the entire McKinsey formula because it undervalues some businesses—for example, some with high brand strength, high barriers to entry, and limited competition.[130]

---

[129] Notably, the petitioners do not argue for their expert's terminal investment rate. Instead, they "assert that the 27.75% TIR in the Opinion was reasonable in light of its factual findings and credibility determinations regarding Hubbard. Further, the delta can be explained by [Jarden's] failure to capitalize investment that is expensed immediately and by ignoring the expectations of everyone involved with the deal that Jarden would continue to make a profit on new investment in the future." Reply Br. at 14 n.63.

[130] The supporting section of McKinsey's book states in full:

> Many financial analysts routinely assume that the incremental return on capital during the continuing-value [i.e. terminal] period will equal the cost of capital. This practice relieves them of having to forecast a growth rate, since growth in this case neither adds nor destroys value. For some businesses, this assumption is too conservative. For example, both Coca-Cola's and PepsiCo's soft-drink businesses earn high returns on invested capital, and their returns are unlikely to fall substantially as they continue to grow, due to the strength of their brands, high barriers to entry, and limited competition. For these businesses, an assumption that RONIC equals WACC would understate their values. This problem applies equally to almost any business selling a product or service that is unlikely to be duplicated,

41

And because the court found that Jarden was unique and had high barriers to entry, the petitioners argue that it fits within the class of businesses that the McKinsey formula might undervalue.[131] Further, they argue that the court failed to explain why its terminal investment rate was higher than historical rates "just to sustain inflation-driven growth."[132]

First, we note that the Court of Chancery did not rely on its DCF model to find fair value, other than to use the corrected model to corroborate the unaffected market price. Second, the wide swing in value attributed to one input in the DCF model supports the reason the court did not rely on it—a lack of confidence that the experts were providing reliable economic advice on the inputs driving the DCF model. And finally, as best we can tell, the petitioners' argument that the McKinsey formula undervalued Jarden because it was in a certain class of companies lacks support from the experts.[133] Dr. Hubbard testified to the contrary, and Dr. Zmijewski

---

including many pharmaceutical companies, numerous consumer products companies, and some software companies.

However, even if RONIC remains high, growth will drop as the market matures. Therefore, any assumption that RONIC is greater than WACC should be coupled with an economically reasonable growth rate.

App. to Opening Br. at A1495 (Tim Koller et al., McKinsey & Co., *Valuation: Measuring and Managing the Value of Companies* 260 (Wiley, 6th ed. 2015)) (internal footnote omitted).
[131] *See Jarden*, 2019 WL 3244085, at *6 (describing Jarden as "concentrated on acquiring top brands in niche markets," which "developed secure trenches that presented barriers to others who might look to compete with Jarden's niche product lines").
[132] Opening Br. at 40.
[133] *See id*. at 39–42 (citing no expert support); App. to Answering Br. at B551 (Dr. Hubbard, in his rebuttal report, stated that "the Zmijewski Report provides no evidence to support his embedded

criticized the court's use of the formula for other reasons.[134]  Further, while the petitioners cite McKinsey's concerns about undervaluing certain companies, they do not provide support for re-adopting the court's original solution to split the difference.[135]

As for whether the court's explanation was adequate, the court originally found Dr. Hubbard's testimony credible and the McKinsey formula appropriate, yet deviated from its application by splitting the difference between Dr. Hubbard's proposed value and the recent historical average and implying a RONIC higher than Jarden's WACC.[136]  On reargument, the court stated that it had "improperly depart[ed]" from the McKinsey formula and "no longer [saw] a basis to account or adjust for the unjustified sixth year of comparable growth."[137]  The court also noted

assumption that Jarden had a sustainable competitive advantage allowing it to generate returns far in excess of its cost of capital indefinitely.").

[134] The petitioners re-raise several of Dr. Zmijewski's criticisms on reply.  They argue the court's application of the McKinsey formula assumed improperly that Jarden will need to invest capital to grow at the rate of inflation, Jarden's industry will no longer be able to profit on new investment after 2021, and the court misapplied the McKinsey formula by "ignoring other types of investments that must be included when calculating required investment and RONIC."  Reply Br. at 14–17 (emphasis omitted).  The court considered and rejected these arguments, and the petitioners fail to show that doing so was an abuse of discretion.

[135] *Jarden*, 2019 WL 4464636, at *3 n.11 ("Respondent makes a valid point that the Court did not cite to finance literature or the record in reaching its 'blended TIR.'"); *see* App. to Opening Br. at A712 (Dr. Hubbard testified that "past data on investment don't inform my model [for terminal investment rate] at all."); App. to Answering Br. at B91 ("While historical investment rates can be used as a reference point, both financial theory and application of the investment rate formula *g/RONIC* focuses on the future.").

[136]*Jarden*, 2019 WL 3244085 at *41 ("Dr. Hubbard's testimony that, in competitive industries, the return on new invested capital should equal the company's WACC was credible, and it is supported by the valuation treatises.").

[137] *Jarden*, 2019 WL 4464636, at *3.

that it "did not cite to finance literature or the record in reaching its 'blended TIR.'"[138]  Based on the record before the court, the court did not abuse its discretion by applying the McKinsey formula in its post-trial opinion or correcting what it believed was an erroneous application of the formula on reargument.

## III.

We affirm the Court of Chancery's judgment.

---

[138] *Id.* at *3 n.11; *see* App. to Answering Br. at B91 ("The Court obtained this rate [of 27.75 percent] based on averaging my 33.9 percent terminal investment rate and the 21.6 percent historical five-year average.  I am not aware of support for such an approach.") (footnote omitted).